Case number 11-3755 is validated with 11-3756. Rosalind Franklin University v. Lexington Insurance. Ron, we switched up the slides. We have to pause on the slides. We didn't see the slides. Yes. We have agreed, Your Honor. I'm Michael Granger here for Rosalind Franklin. I think we've agreed to 10-10-10. At least a couple of us are trying to reserve a few moments of our first eight or nine minutes. Okay. And I'm Paula Parsonson for Lexington Insurance. I'm going to reserve two minutes. Okay. As I said, Your Honor, good morning. I represent Lexington Insurance Company, the insurer that issued the primary and excess professional liability policies to Rosalind. I'm going to first address the trial court's ruling that Lexington had a duty to defend, the presupposition that the complaint did not trigger such a duty. The insurer has a duty to defend if the allegations of the complaint place the claims potentially within coverage. But that duty is determined by the actual factual allegations of the complaint, not simply by slapping a legal theory such as negligence on a claim that doesn't really assert negligence. Well, in the underlying case, were you participating in it? Pardon? Were you participating? In the underlying? No, I was not. You mean the Pollack complaint? Mm-hmm. Was Lexington participating in the underlying complaint? No, they were not. Well, who hired the attorney then? Pardon? Who hired the attorney, the lead attorney? The lead attorney, again, last time I went over my timeline to look at this, what happened was Roslyn was defended for the first six months of this case by Gardner Carton, Gardner, I'm going to say Gardner firm. Robert Bolt was brought in just before the TRO proceedings started, weeks before, a couple weeks before. We were not advised, Lexington was not advised of Gardner Carton's involvement. We were not given anything to show that the SIR had been exhausted. There was a $100,000 self-insured retention, and Bolt came in representing at the request of Patricia Bergenson, the general counsel of Roslyn, to represent them. This is a type of situation where we were under the belief that they were selecting him as their counsel pursuant to their right to do so, as they did so in the past under the SIR. When Bolt got the complaint, he sent it to you. You sent it to Lexington. He did send a copy to put us on notice of the complaint. And he discussed it with your agent. At what point, Your Honor? When he forwarded the complaint to Lexington. He got on the telephone, talked with the agent in charge, and he said, Bolt said, that they were both on board, Lexington and Roslyn. I don't believe you said that they were both on board. They forwarded the complaint to us. We had a copy of the complaint. During the various times before the TRO, he did send updates concerning the case to us, as he would do as the representative of the insurer. He would keep the insurer advised. Didn't your company use this attorney on cases? He was not what was called our panel counsel. So he was someone who was on the list that Roslyn would use. We had used him before for other types of cases, not medical negligence cases. He was not one of our panel counsel that we regularly used. He was on a list of attorneys that Roslyn had approved could be used on their cases. So here, the evidence is, from our perspective, that we were under the assumption he was operating under the self-insured intention when he was retained. And I would like to point out, too, I assume you're driving towards the whole estoppel issue. Before you get to that, did the court make a finding that that lawyer was retained by the insurance company? The court did make a finding that he was retained. We believe that that was an erroneous finding. At best, there's disputed issues back to that finding, but we believe that doesn't prevent an overturning of the estoppel situation in this case, because there was just no evidence that they were prejudiced by Mr. Volk's representation. As I said, I mean, the timeline is, for six months, they were represented by a very well-regarded law firm. Mr. Volk, a very well-regarded lawyer, he came in. He was working with general counsel during the TRO. He kept her advised of everything. You can't just show estoppel by claiming you have to also show there was some prejudice in the representation, and there is simply no showing of that here in this case. And then if I could, I would return to my point as to why the duty to defend was not even triggered by the complaint allegations. And again, you have to look at the complaint as a whole. I did medical malpractice for a long time, and this complaint does not allege, even though it's got a claim, I'll admit, titled negligence, it doesn't allege that the study was terminated as the result of an exercise of medical judgment or a deviation from accepted standards of practice. There's no allegation that they negligently gave a patient the wrong medication. It all focuses on rather deliberate, wrongful termination of an experimental vaccine program. Yes, but once you terminate the program, then there becomes a question of medical judgment. When people claim that their condition is going to be aggravated as a result of not being on the program, then it becomes a question of medical judgment, does it not? I don't believe that as this complaint is set up, that is what they were alleging. And I would direct, again, they attached a health care affidavit to the complaint, supplied by a doctor who was the husband of one of the claimants, and what that said is that they were unfairly denied the vaccine and that there potentially could be some future injuries. That's not the same, Your Honor, as saying there was a deviation from the standard of practice that was a proximate cause of these women's injuries. You don't issue an insurance policy to cover something that potentially... Yes, but does a court look at that affidavit to determine whether it is a medical malpractice case? Well, the affidavit was attached to the complaint, so I would say it's part of the complaint. And I would say... Well, maybe it could have been stricken on a motion, but the question is you still have the complaint as to what the complaint says. Well, the complaint, again, I would say does not say that. First of all, the negligence count incorporates the first 68 paragraphs of the whole complaint. Those contain allegations of knowing conduct, that the administration, under the leadership of its new president, arranged to discontinue the study on a contextual basis. They were denied the study. The funds were diverted. What the claimants were seeking was reinstatement of the program or a dischargement of the funds. It says in the complaint... The allegation is Roslyn committed negligence by improperly managing and administering the Springer vaccine program. You know, this is not an allegation directed at medical negligence. It's directed at a wrongful business act that is not covered by the policy. And we, therefore, would take the position that, first of all, since there's no defense obligation to begin with, you don't even have to get to estoppel. And then secondly, as we've already discussed, there was no estoppel here because this record is just void of any evidence that there was prejudice with regard to Mr. Volk's representation here. You know, there's nothing showing Ms. Ledroslyn, Ms. Ferguson was standing with him when he talked to Bonfello during the settlement negotiations. He conveyed to her that they're not going to participate. You know, this is not a typical case where some of the cases cited by plaintiffs, they go on for six, seven years, and then the insurer reserves their rights. This is happening, at least with respect to Volk's representation, in a matter of weeks and very quickly. We didn't have information about the SIR. We didn't have information about other aspects of the settlement. And we plainly told them we were having it out for a coverage review. Under these facts, there's just simply not an estoppel on the duty to defend. Well, did you send a reservation of rights letter out? We did send one two days. At what point? We sent one two days after they had agreed to the settlement in principle, but it was contingent on approval of the board's approval, of Roslyn's board's approval. It set forth the basis, including that it's not a medical incident, that it was alleged under the complaint, that the SIR had not been exhausted, and other grounds. So when they presented the settlement to the board, they were aware that Landmark had denied coverage, and they were aware that Lexington had reserved its rights. But when Lexington sent the reservation letter, you didn't say it was on a voluntary payment defense, even though you knew that they were ready to settle for that amount. I believe you're correct that the letter itself did not state that, Your Honor, but we don't believe that that results in a waiver of that defense. They knew our position. They went ahead and settled anyway. So they knew you had some coverage issues. They didn't know the exact issues. Well, I think it's fair to assume that that would be one issue, because we're telling them at that point we're reserving our rights with respect to the settlement. What were the damages that were alleged in the underlying complaint? I was just looking at that right before we convened. And the damages really were seeking... Let me rephrase that. I'm not asking what the damages that were sought. What were the alleged injuries that were received by the participants that are claiming that they were the victims of medical malpractice? How are they injured? Or at least how is it alleged that they were injured? It's alleged that they suffered emotional trauma because they were denied a potentially lifesaving vaccine. It was not alleged that there's any proof or proximate cause that this would result in recurrence. In fact, when they entered the study as attached to the complaint, it's a research protocol. They're specifically told in the study that this might not do anything. You are not a patient. You're not receiving medical treatment. You're a research subject. So again, I believe the complaint does not state a claim for medical negligence. You have to have some physical injury, don't you? They're claiming that they may have a recurrence of the disease and they may have a shorter lifespan. In tort law, don't you have to have an actual injury instead of a speculative injury in order to allege a cause of injury? So in the insurance coverage realm, does the fact that there's this damages issue in the underlying medical malpractice account, does that go to the question of whether it's a covered claim or does it go to the question of whether there's a reasonable anticipation of liability? It goes to whether there's a covered claim and to both. Whether there's a covered claim because, as I said in the beginning of my presentation, you can't just put a negligence label on something. You have to look at what is actually sought. I think you'll hear more from Ms. Limber on this. A big part of what they sought was a disgorgement of these funds and they weren't alleging really specific injuries caused by medical negligence. I just don't believe that's what that counts. We were unfairly denied. It all goes back to the wrongful business decision. Is my time up, Your Honor? I wanted to talk just briefly. I won't be able to cover everything and I'll reserve some rebuttal for this, but for the reasons explained why there's no medical negligence, there's also no duty to indemnify under either the primary or excess policy. And then Judge Dillard correctly ruled at the end of the case, Roslyn has a cross appeal on this on the bad faith. There's simply no bad faith here given the very short time frame that took place that we didn't have information about the SIR. And then the trial court here found there was a legitimate coverage dispute so that we did not act facetiously and unreasonable in taking our position in the way this case laid out. Therefore, Your Honor, we would ask the court to reverse the finding that this is a medical incident covered by our policy, overturn the judgment entered against us on the duty to defend and the duty to indemnify, and also overturn the finding that there was any indemnification obligated on under either policy and affirm the finding with respect to the bad faith and for whatever other relief we requested. Thank you. Good morning, Your Honor. It's Natalie Limber on behalf of Landmark American Insurance Company. Landmark American Insurance Company, or Landmark as I'll refer to them, is the director's and officer's liability carrier for Roslyn Franklin. This case is about donated funds earmarked for the lifetime treatment of breast cancer patients and disgorged to settle claims by those patients based upon the termination or failure to render medical treatment. Roslyn didn't disgorge the funds, though, did they? Yes, they did. They paid it out of general obligation or general operating expenses, not out of the trust fund. One, Your Honor. They're still using the trust fund for cancer research, aren't they? They are, but that's an accounting issue. One, there's no citation in the record by Roslyn for the source of the funds, but it can be certainly inferred from the fact that this was a disgorgement. The amount of the settlement was the exact amount that Dr. Springer originally donated. Two, Dr. Springer made it clear through his donation agreement, which was supported by affidavits from his children and colleagues, that these funds were donated for the specific purpose of continuing this program for the ad infinitum treatment. But that wasn't the agreement that the doctor signed when he created the trust. It was for just general cancer research. It wasn't just for this TN study. When he gave it to the hospital. The donation agreement did provide for cancer research. Genetic cancer research. Correct. But it set up the Bly's Laboratory, this institution that was named for Dr. Springer's wife, who passed away from breast cancer. This was his life's mission, and this is what he wanted to continue. Not only that, the consent forms entered into by the patients provided that they were to receive this ad infinitum for the rest of their lives. Roslyn could not have diverted these funds to other cancer research without violating those consent forms that were signed by these patients. So if they had diverted at some point all of the funds to, for instance, Hodgkin's lymphoma research and deprived these patients of their care, they couldn't have done that without running afoul of the consent forms. So therefore, they were not able to do whatever cancer research that they wanted to do with this money. So when they paid the money to these patients so that they could take this money that was intended for their benefit and their cancer treatment and started anew and get FDA approval at another institution, it was a disgorgement. The fact that the donation agreement says cancer research is mitigated by all of the other evidence in the case that was discovered about what his intent was and what the patients expected. So since the patients were guaranteed this research for the rest of their lives, therefore when the hospital stopped the treatment, then the patients were injured? The patients were injured. Yes, Your Honor. The injury here, if we're talking now in terms of medical malpractice, is based on the doctrine of informed consent. These patients consented to be a part of this program based on representations that were made to them when they signed up for the program that they were going to be getting an effective treatment for the rest of their lives. They testified at the preliminary injunction hearing that they would not have cut that. Had they known of the risk that a key vaccine ingredient would have run out or that the program could have been terminated prematurely, then they said they would not have signed up for the program. And they are damaged because their participation in this program precluded them from participating in other programs. There's no determination here that anyone was damaged. There's only allegations of damage. Well, Your Honor, the way that the case proceeded, it was clear that that was the direction that they were heading in terms of their in terms of the only allegations that were tolerable in this case. Here, let me ask you some simple questions because I think we're going down the wrong road here. Sure. What did Landmark ensure? Landmark ensures what's known as entity coverage under a director's officer's liability policy. Let's stop for a moment. Okay. What Landmark is doing is they're ensuring the decision-making process of the board of directors. Is that correct? Yes. So when the board of directors abuse their fiduciary duty, then there's coverage. Isn't that true? To Rosalind Franklin, yes. They owe a fiduciary duty to Rosalind Franklin. Okay. And there was allegations in the underlying Pollack complaint of breach of a fiduciary duty, was there not? That is correct. That fiduciary duty arises out of the patient relationship between the patient and Rosalind Franklin, not out of a fiduciary obligation of Rosalind Franklin's director. Doesn't it come into play that Rosalind had a board of directors and that board of directors decided to terminate the program? Actually, it's not the board of directors. It's the institutional review board. Okay, but it's the same. They sit in this, no? No. They don't sit in the same place? The institutional review board is a federally mandated board under FDA regulations. The IRB and our briefs cite a Seventh Circuit case that kind of describes this. Well, they gave a recommendation, didn't they? The institutional review board is there to protect patient human subjects that are part of a research institution. So they make the decision whether to continue or terminate a research protocol based on, and in this case their decision was based on a lack of scientific validity, a lack of evidence of efficacy, lack of appropriate safety protocols. Okay, so Rosalind's board had nothing to do with that. There was one member on the board. Your general counsel was on the IRB, wasn't she? Patricia? The person who was representing the hospital was on the IRB board and then she gave recommendations to the board of directors. Yes. The institutional review board per FDA regulations does have to have a non-medical professional. Okay, so did the board of directors have anything to do with their decision-making process and the termination of the plan? Your Honor, I believe that eventually it did have to be, I don't know. Okay. I'll be honest, I don't know. Okay, all right. The issues in this case have focused on the role of the institutional review board and the decision-making process of the institutional review board, not on the board of directors of Rosalind Franklin. Okay. And it's been characterized that the institutional review board made an administrative decision and that's not the role under FDA regulations of the institutional review board and that's not the role that they played in this case. Okay. What's the role of this consent form wherein it provides, as alleged by Lexington, it provides that it's acknowledged that the procedures involved in the research are not part of my routine treatment and are not intended to potentially benefit my personal health. How can it be medical malpractice if it's not intended to benefit their personal health and it's acknowledged by them that that's the case? The consent form also specifies that they will be injected intradermally amounts of an antigen. Well, yeah, it's a research study. But the underlying reason for it is research and they're acknowledging when they sign this form that it's not for their benefit. It's not for their health. It's for the future. But the consent form also indicates that what the vaccine does is boost their immunity against the recurrence of breast cancer. It tells the patients that the patients believed this and testified that they were told at the outset of the program that this was a life-saving treatment. That was the theme that was presented by the underlying plaintiffs in this case, that this was a life-saving treatment that prevented the recurrence of breast cancer, that this was a matter of life and death, which is why it was presented at a preliminary injunction hearing. What is that language? What does it mean? It's not for my personal health. Is it just nothing? Is it just surplus? Is it meaningless? That it is not to be a substitute, Your Honor, for conventional medical treatment. Well, it doesn't say that, does it? It doesn't say this is a substitute. It says this is not intended to potentially benefit my personal health. This is what it says. So isn't that the claimant saying, this is really not for me. This is for society. Where they believed, though, that this was... So they didn't believe what they signed? Is that what you're saying? They said that. They testified. Well, what's the effect of that? The effect of their testimony? What's the effect of the fact that they said, well, I signed it, but I didn't believe it? For purposes of a medical malpractice case, I believe it would be a question of fact. And therefore, there could still be reasonable anticipation of liability for a medical malpractice claim, irrespective of the credibility of their testimony in terms of whether they were injured or not. Because they were made other oral representations. Not just oral. But the consent form said that the purpose of the vaccine, or what Springer believed the vaccine could do, was boost their ability to fight the recurrence of breast cancer. So that statement would have just been an eventual hearing on the merits, which we did not get to because the preliminary injunction hearing was going, as Patricia Berkson put it, badly. They were sympathetic. It would have simply gone to their credibility in terms of whether or not they were informed of the risks for purposes of breach of the duty to give informed consent. I have just one last one. Lexington says that the $500,000 for the pain and suffering was really attorney's fees. And therefore, Landmark should be able to pay for that. What do you respond to that as? The plain language of the settlement agreement is not sufficiently contradicted by the speculative testimony of Mr. Vogt. It says it's for pain and suffering. The trial court agreed that that plain language fell within the bodily injury exclusion of the Landmark policy and Vogt's speculation as to the motivations of the underlying plaintiff's attorneys for carving out that amount. It's unfounded. Thank you. Justices, may I please record the counsel? Again, my name is Michael Gregg, and my colleague Danita Davis and I are here on behalf of Rosalind Franklin, University of Medicine and Science. I'd like to begin by addressing a question that Justice Palmer asked, and I believe Your Honor asked, what were the damages alleged in the medical negligence count of the Pollack complaint? And I would like to respond to that by saying that every count of the complaint, including the medical negligence count, sought actual compensatory and consequential damages. But importantly for our purposes here, we have to examine whether there was a potential for coverage under both policies, but as to the count seven medical negligence count, we must look at whether there was a potential that bodily injury damages could potentially be sought in that case or potentially alleged. And it is Rosalind's position that the allegations that not only did the plaintiff suffer trauma, but they had been shortened life, their lives had been shortened. What was the trauma? I'm sorry, Your Honor? You just said they suffered trauma. Oh, I believe they alleged to have suffered emotional trauma, which I understand the distinction between emotional trauma and physical injury. But I do believe that the complaint alleged the potential for bodily injury in that it alleged that the patient's lives had been threatened and shortened, actually alleged they had been shortened by the withdrawal of life-saving medicine. Can you collect in torts for the potential for future bodily injury? Being a coverage lawyer and not an all-the-time court lawyer, I believe there is some, my view is that there is some needed establishment of bodily injury to connect with the emotional trauma in order to recover. But we are not talking about, in the first instance, the obligation to ultimately indemnify. We are looking at whether an insurer that has a duty to defend is presented with a lawsuit that potentially alleges a covered claim. And we submit that the allegations in the Pollock complaint, that the patient's lives had been shortened by withdrawal of life-saving medicine, creates the potential that we're talking about bodily injury claims. And it is that standard that governs the duty to defend. Brad, not the duty to defend. Are we also talking about the duty to indemnify in this case? In Lexington's case, it is Roslyn's position that the duty to indemnify was established through Lexington's conduct and it amounted to an estoppel for a breach of the two most fundamental Illinois insurance coverage principles that exist. And that is that they breached both the Pepper's Doctrine and the Illinois Estoppel Doctrine. And I believe that the case does not fit squarely within either the Pepper's or Estoppel Doctrine, but that is because Lexington's conduct here was more egregiously abusive to the university than the typical Pepper's or Estoppel cases. And I would tell you here's what they did. Lexington first has judicially admitted in response to Interrogatory No. 14 that they asked Attorney Vogt to come out and defend Roslyn. Now, that was done in April of 2004, not weeks before the preliminary injunction hearing, but several months before the preliminary injunction hearing. Mr. Vogt testified that he was not acting as independent or Pepper's counsel, but rather he was acting in his normal course of insurance defense practice that he had been engaged in throughout his career where he had two clients. One was the insured and one was the insurer. And, of course, he couldn't have been acting as Pepper's counsel because Lexington never reserved its rights until after a settlement agreement in principle was reached. Therefore, Mr. Vogt had no basis on which to determine whether Lexington's and his other client, the university's, interests were in conflict. Now, Lexington... Wait, didn't they send a letter the day before that there would be no money needed from AIG? So wouldn't that make it a conflict? The letter contained that language and additional language. What that letter said, the university is going to make a first offer, and that offer is going to be to restart the vaccine program. And then Mr. Vogt said to Mr. Bonfalla, AIG's representative, I don't think they're going to accept that offer. Instead, I think they're going to want money. So he clearly told Lexington in that letter, yes, we're making an offer, but I don't believe that offer is going to work, and we're going to have to come to you for money. Now, up until that point... I want to make sure I understand the transition that you just made. Yes, Your Honor. Your position is that Lexington is liable for indemnity because they're staffed from raising the exclusion of medical malpractice? I believe they're... Or staffed based on the Pepper's doctrine? I believe they're staffed because they violated both doctrines. Okay, but it's not based on... What's your position with regard to what I asked initially? I mean, if we go around and stop the question, is this medical malpractice or not? I mean, I keep coming back to the point that a medical malpractice claim, there has to be injury. And so I understand you don't want to go to that because you think they're staffed from raising that covers the funds, but what about that covers the funds? What's Roslyn's position with regard to the covers the funds? I have to separate it into two components, Your Honor. First, there is the duty to defend. The defense obligation is broader than the indemnity obligation, and it is triggered if there is the mere potentiality that a single component of a multi-count complaint could be covered. Here we had a medical negligence count that pled that the plaintiffs had been injured because their lives had been shortened by the withdrawal of life-saving medicine. It is that allegation, Your Honor, that I think triggers the defense obligation for Lexington. I think once that happened, the remaining course of the case is such that there was no trier of fact or trier of law that ever got to that question because subsequently that count, along with the D&O counts, were all settled in reasonable anticipation of liability for otherwise covered claims. And as this Court knows, that was the standard in the U.S. Gypsum case that this Court authored. And I think, Your Honor, that the Peppers and Estoppel doctrines were both breached by the manner in which they treated their insured. And once they mistreated their insured in the manners that I am speaking about, then that exclusion that they rely on, not exclusion, but the failure, their coverage defense, but it doesn't amount to a med-mal claim, has been their stop from asserting it under ELCO and the whole body of Illinois coverage cases. I think it's telling that this reservation of rights letter that Lexington ultimately sent was two days after the settlement agreement in principle, which was entered into with Lexington's full knowledge. The case had been ongoing not for a matter of weeks, but Mr. Bork was actually told to go out and defend Lexington back in April of 2004 when an initial draft complaint was sent to the University and to Lexington. So he had been on the case for a number of months, not merely for weeks. And Lexington had been fully advised of the claim throughout that period of time. Now Lexington's representative had an opportunity to participate in negotiations. Mr. Bork called him a few times. Ms. Bergeson called him a few times. Her calls went unanswered. And, in fact, I think to your honor's point, Justice Taylor, the University did make an offer to restart the program, just as Mr. Bork had advised Mr. Bonfalla, but that offer, as he suspected, would be rejected. And instead the plaintiffs demanded a money settlement. Now, after the settlement agreement in principle and after the reservation of rights letter, Lexington was utterly silent while the agreement was actually being drafted and executed. During that time period, Lexington actually received draft settlement agreements and they were asked to comment on them. Never once did they raise the concept that the University's following through on the settlement would be an uninsured voluntary payment. They also failed in that reservation of rights letter or ever to disclose to the University that there was a conflict between the insurer's interests and the insured's interests. Not only did they neglect to advise of the conflict, they never advised that the University had the right to select its own counsel. And so that counsel that was selected by Lexington was the drafter of the agreement of which, in part, Lexington now complains. And finally, it declined to defend its insured and to pay for the settlement after the deal had been consummated, the releases had been signed, and the money had been paid. So they pretended for about three quarters of a year to defend its insured, but they didn't. They sent an untimely reservation of rights that never advised of conflicts, never gave them the right to select their own counsel. They ignored draft settlement agreements, sought their input, never telling them, never telling the University that it had problems, and then it denied coverage without ever having filed a declaratory judgment action. So as we heard, Lexington's first contention is that its defense obligation was never triggered because essentially they believe it's a D&O claim. Well, the University agrees it is a D&O claim, but it's also a medical malpractice claim, wherein Comp 7, as we've discussed, is a medical negligence claim supported by a healing arts affidavit. But Lexington... I know it's Roswell's position that both of these insurance companies are liable. How do we resolve this question of what the... I'm looking for the term, the core complaint of the underlying complaint is. Should we be looking to the central focus of the underlying complaint, or should we be looking to the fact that, in a good faith way, that several claims are alleged that involve coverage under both policies? I believe that what Illinois law supports, Illinois precedent supports, is your Honor's latter position, and that is this underlying complaint contained allegations that were covered under both policies. Ms. Bergeson, the general counsel of Roswell, testified that when she entered that settlement agreement, in principle, she was settling D&O claims and she was settling med mal claims. She was very concerned about 57 breast cancer bodily injury claims, and she was very concerned about breach of fiduciary duty D&O claims. I think under U.S. Gypsum and other lines of cases, you do not have to have a single type of claim that you are settling. If there is a claim that you are settling in reasonable anticipation of liability and it is covered under one policy, then it's appropriate. If that reasonable anticipation of liability extends to counts covered under the other policy, then it, too, is covered. And I think importantly here, not to be glib, but I think in our jurisdiction, I'll call them medical negligence bodily injury claims and the D&O claims of 57 breast cancer patients certainly settled for $3 million is certainly a reasonable settlement in anticipation of litigation. I hope that responds to your honors. Thank you. Well, Flexington's next contention is that it didn't appoint Bob, though. He appeared magically, or he appeared at Roswell's behest. By the way, he was appointed, excuse me, Roswell, Lexington declined coverage precisely nine years to the day ago, to this day. It still hasn't paid a penny of the defense costs that Mr. Vogt incurred. Roswell has shouldered those expenses for the last nine years. So besides Lexington making a judicial admission that it asked Mr. Vogt to defend Roswell, it also contends that Ms. Bergeson really controlled the defense and that therefore the university suffered no prejudice from Mr. Vogt's appointment. But Ms. Bergeson did not file an appearance in the case. She didn't draft any pleadings or motions. She interrogated no witnesses at the preliminary injunction hearing. She didn't write any reports to Lexington. And very importantly, she didn't write the settlement agreement. So imagine in Illinois... She controlled everything that was going on. I don't believe the record supports... I guess she never had a client who went to law school but never did litigation. They're the smartest people in the room. I agree, Your Honor. That's true. Right, and they controlled. But she was an experienced litigator. She controlled it in the same way that any client, any insurer, who is involved in a claim where a defense lawyer has been appointed by an insurer, gets involved in the claims. You know, an insurer's defense lawyer owes two duties. It owes its ultimate duty to its client to which it has been appointed to defend. But it also has an attorney-client relationship with the insurer. And in this instance, certainly Ms. Bergeson participated in the defense.  Heavy participation in a defense and cooperation and involvement is not viewed as performing the assistance and cooperation condition of a policy, but is rather viewed as obviating and otherwise letting an insurer off the hook. How does the hospital hurt? Where was the detriment? You got what you wanted. No, we haven't gotten what we wanted, Your Honor. How was Mr. Bolt's activity determined towards your client? One thing comes to mind, Your Honor. In the settlement agreement, the university agreed to put $2.5 million of the settlement into a trust for the purpose of the underlying plaintiffs to seek FDA approval to restart the program. Now, that program, that FDA approval was never obtained, and the money was ultimately distributed to the plaintiffs by way of a cash settlement. And I know that plaintiff's counsel is here in the courtroom today. Landmark and Lexington are here saying that that provision in the settlement agreement constitutes a disgorgement rather than a loss covered under either of their policies. I would submit that the litigation that we have been in for the last seven years is prejudice enough without seeing a penny in defense costs or a penny in the settlement costs. Just taking a half a step back, I'm sorry to do this to you. Not at all. Just taking a half a step back, too, before we get to prejudice, this question of control, tell me why this question of control shouldn't just be considered to be a question of material fact that's unresolved. Well, I don't think the facts of what actually happened are at all in dispute. It is clear to all the parties that Ms. Bergeson met with Mr. Vogt, helped him gather documents, did not attend the first day of the preliminary injunction hearing, but was there the second day to negotiate settlement. She was very active in the case. But can you imagine in Illinois where a corporate client who has its general counsel get involved in a case is subsequently determined to having controlled its defense for purposes of the insurance obligations of an insurer under the Peppers or Estoppel Doctrines. That's utterly inconsistent with every case I've ever read. I think that an involved insurer is something that insurers seek. It helps them to defend their case. And that's what happened here. And nothing more. Controlling the defense to me, Your Honor, is when you file an appearance and you draft pleadings and you draft motions and you interrogate witnesses, that's controlling a defense. That didn't happen here at all. And in fact, I was just going to say the university relieved the Gardner firm once Bob Vogt was appointed. There were other issues with Gardner Park at that time, but it is undisputed that Mr. Vogt's involvement in the case provided the basis on which for him to proceed as the sole defense lawyer. That's what Ms. Bergeson testified to, and her testimony is unrebutted. I'm sorry. Yes, thanks. Your example of prejudice in support of the estoppel argument that you just gave us was the fact that this $2.5 million was put into a trust as part of the settlement agreement, and now you're facing this gorgement issue. Ms. Bergeson was aware of this portion of the settlement agreement, wasn't she? And I assume, or maybe somebody's record must show that she, on behalf of Roslyn, consented to it, didn't she? I believe that's correct, Your Honor. So where's the prejudice? Because a general counsel is a lawyer, does not mean that that lawyer should automatically understand the Illinois PEPPERS or independent counsel rule. It doesn't mean that the carrier is relieved of its obligations to tell its insured, my interest conflicts with yours. I want to get out of coverage, and you want to beat the plaintiffs. And in some ways, I can't serve your interest in doing that. That's what an insured is entitled to, whether their involved agent or employee is a lawyer or not. There's no testimony that Ms. Bergeson knew anything about insurance coverage, and yet now we are here on a very, let's say, arcane issue of insurance coverage. Aren't they all? But just so I make sure I understand your point there, So Mr. Vogt is in a position where he's put something into the settlement agreement, which now ultimately, if it's determined to be a disgorgement, ultimately would benefit the insurance companies versus your client. Yes, that's correct, Your Honor. Additionally, That's one example. The other is that Lexington is now here saying it's not a Med-Mal claim. Well, if it's not a Med-Mal claim, then why was Mr. Vogt out there defending the university? We were entitled to know, specifically, not just in some murky, mysterious fashion, that the insurer had an interest in proving that this wasn't a Med-Mal claim. We couldn't tell that necessarily from the reservation of rights. And it's a bedrock core principle of the independent counsel rule that the insurer has to be told what the conflict is. And then it has to be given the right to pick its own lawyer or to waive the conflict and proceed with, in this case, Mr. Vogt. That was never done. That wasn't done in the reservation of rights. It wasn't done as the settlement agreements were being drafted. It wasn't done in the declination letter. And it was never done before the settlement agreement in principle. And it is our contention that that breaches the Pepper's Doctrine. Now, as to – I mean, I would say this. Imagine in Illinois where an insurer can beat the Pepper's Doctrine by merely waiting to reserve its rights until after a deal is reached. That's contrary, again, to every case I've ever read on the topic. As to the Estoppel Doctrine, the heart of it is that an insurer that breaches its duty to defend and fails to file a D.J. action is a stop from asserting the very coverage defenses we're talking about here. So here, I think it's inarguable that Lexington never really defended its insurer. Although it pretended to send the lawyer out, it never paid a penny in defense costs and ultimately denied to defend. And then it denied coverage. And then it never filed a D.J. So imagine in Illinois where an insurer can beat the Estoppel Doctrine merely by pretending to defend and then waiting until the case is settled and then declining coverage. That's why this case doesn't fit neatly into other Estoppel cases because at least in the other Estoppel cases, the insurer has the courtesy of declining coverage before the case is over. We submit that this isn't only a breach of those two doctrines, but it also amounts to bad faith. Now, I will address the Estoppel issues if it pleases the court. Or I will sit down. Who's supposed to pay votes? Well, Lexington is supposed to pay votes. Absolutely. I didn't ask that out of the way. I mean, who? Is Bolton paid? Yes, Roslyn paid. Absolutely. That's undisputed. Nine years later, Mr. Bolton has been fully recompensed for nearly a decade, and the university has sat without him. Well, he was paid initially by the university, wasn't he? Every penny of his fees for the case was paid by the university. It is true, Your Honor, that the university paid the first $100,000 of his fees as part of its self-insured retention. And we are in agreement that the university owes $100,000 and has paid $100,000 as its self-insured retention. When the bill got over $100,000, the university still paid? Absolutely, Your Honor, yes. It has made Mr. Bolton whole. On the disgorgement issues, every case that I read has two components. The first is that the insured had to have essentially stolen the plaintiff's money. Judge Posner said you can call it stealing or you can call it by some other nicer name, but that's the central component. It had to take money from someone to which it was not entitled. And the second necessary element is that the insured must not have suffered a loss, which this court has interpreted as a deprivation. So here the university stole nothing. It accepted $18 million in gifts from Dr. Springer over the years, and those gifts were given for cancer research, and that's what the money was used for. There's not a scintilla of evidence anywhere that any penny of that $18 million was ever used for anything other than cancer research, and it continues today to be used for cancer research. There's a document in the certified record that wasn't mentioned, I don't think in anyone's briefs, but it's at C5116-5340. It lists the value of the Bly Laboratories principal amount of the segregated account at the time of the settlement agreement as $7 million. The insurers argue that the $2.5 million component of the settlement was really a turnover or a disgorgement of Dr. Springer's initial first gift, which was $2.5 million in bank stock that had a book value of $2.5 at that time. And we submit that the whole Bly Laboratory balance of $7 million. Dr. Springer gave $18 million over the years. The $2.5 had nothing to do with any balance or any specific gift of Dr. Springer. Ms. Limber believes that the only program ongoing at the Bly Laboratories at the time of the settlement was the TTN vaccine program. That's not true. And again, in that same batch of documents in the certified record, there is a report from Dr. Yoon, who was one of the research scientists at the Bly Laboratories. He comments on not just the TTN vaccine program, but there were three other cancer research programs ongoing at the laboratories at the time of the settlement. And in his report, he said, this is what I've been doing for the past several years, and this is what I intend to continue doing at the Bly Laboratories. Again, the settlement had nothing to do with a disgorgement of any funds, and the funds that were paid out didn't come from the Bly Lab. As Your Honor mentioned, those monies came out of the general operating account. And there is evidence in the case to that. There's unrebutted evidence. The only evidence in the case is from the president of the university, its general counsel, and its CFO, who all testified that they had to take that money out of their general operating account. And this speaks to the second element of disgorgement, and that is, did we suffer a loss? Dr. Welch testified, he is the president of the university, that instead of any other means, he had to take $3 million out of the general account, and that that was a substantial, significant portion of the university's entire account, and that it was a great hardship for them to lose that money during the year. Instead of putting money into classrooms, teachers, plans, and equipment, they had to suffer a $3 million loss. And with that, I should stop, unless Your Honors have additional questions. Thank you. Okay, sure, everybody. I just want to point out one statement made. He indicated that both had been on the file for months and months. And looking at my timeline, Gardner filed a notice of removal in August 2004, and in September 2004, Roslyn writes to Gardner and says, given the situation, which was the ethical conflict, the case will now be handled by both. In September 15, 2004, Gardner moves to withdraw, and then in October 27, they start, both advises that they're going to start the preliminary hearing. So then the preliminary hearing started pretty quickly. Both's involvement was very short. I think I heard at an admission that Roslyn was paying these bills. That was the arrangement they had with Lexington, how it typically works when you have these medical centers that appoint counsel under the SIR. They pay the bills. They're obligated to let us know, hey, our retention is exhausted. Your policy is triggered. They never did that. But what evidence is there in the record that Voight was not the lawyer for Lexington? Both's own testimony is his own answers to interrogatories. I cited all of my briefs. He answered interrogatories saying, no, I was not appointed. By Lexington, I was operating under the SIR. Well, how about his testimony? His testimony was, I believe, also, I have my brief up here, so I won't be able to quote it. I believe his testimony was consistent with that. And then this is Bob's outlaw contradicts the testimony also. He says Voight was not, we didn't appoint Voight. He was operating under the SIR. So we do have to. Is it your position that Lexington didn't violate its responsibilities because you hadn't been notified that you were through the SIR? Yes. Ordinarily, you'd have the obligation, once you're notified, you have the obligation to either file a deck action or to defend under a reservation of rights. It doesn't look like you did either until after the settlement was done. So is your excuse for that, that you weren't notified, that you had gone through the $100,000? What's your position on that? Well, that's one of the points in showing that we didn't, that our policy was not triggered. The other point, more specifically, is, you know, Peppers is not a clear-cut, you have to get someone in there to defend. You also have to show prejudice. And there's no, the other point I wanted to make in rebuttal on the prejudice argument is, you know, Ferguson was there. I heard something to the effect that, oh, I know. They didn't reserve our rights. The prejudice invoked, steered the settlement agreement into the $2.5 million. We set a reservation of rights two days after the preliminary hearing injunction where we told them on the phone that there were coverage issues, raising the medical incident, raising discouragement, raising expected and intended and a variety of other defenses. So when they're finalizing the settlement agreement that was ultimately approved, which I think there's no dispute that Ferguson was heavily involved in that, they knew what the coverage issues, there's simply no evidence that Volt was steering this in and out of coverage. And then the other point that I just wanted to get to that I think you alluded to, Justice Palmer, was the established, I keep hearing counsel say that this is a coverage defense. What we're talking about in terms of the medical incident coverage is an insuring agreement. That's not a coverage defense. They have a burden to show that this fell within our insuring agreement. ESTAFL doesn't create coverage where none exists. So if this was not a covered claim, they don't even get to argue ESTAFL. It's our position from the get-go that this is not a covered claim for all the reasons I said before. Thank you. We'll take this case under investigation. I think we have one more rebuttal. Oh, yes, we do have one more rebuttal. A short one. Three very quick points. On the discouragement, Dr. Welch, Brodlund's president and CEO testified that the springer monies were, quote, used entirely to support this study. That's at C-2245. Justice Palmer touched at one point on what the standard is here, whether it's this primary, what we have advocated is that it's a primary focus standard. And what Brodlund has argued is that there are counts. There are, quote, unquote, DNO counts. I want to make very clear, landmark, the question as to landmark is the duty to indemnify. There is no contention that landmark ever owed a duty to defend. So what Brodlund has the burden to show is that they settled a claim actually within the coverage of the landmark policy in anticipation of liability for a claim within that policy, merely pointing to the counts or allegations of the underlying suit or insufficient. Lastly, going to the... How do we resolve that question? If you... And it happens to tell us all the time. You have a complaint that has many counts, and some of the counts would implicate one type of insurance, director's and officer's liability. Yes. Some of the counts implicate professional liability, and then there's just a general settlement. How do we resolve that? This complaint, the entirety of it, I still maintain, does not fall within the landmark policy. Those, quote, unquote, DNO counts seek a disgorgement. Those other counts are for med-mal. But in this case, what we have is the benefit of a preliminary injunction hearing where the underlying plaintiff's attorneys stood up and put forth the theory of their case. That theory is the primary focus and shows what the primary focus of their claim against Brodlund was, which is evidenced by Patricia Bergeson's testimony that that preliminary injunction hearing was the impetus for her to engage in settlement negotiations, which resulted in the ultimate settlement. Additionally, you have both testimonies that what they wanted was a, quote, unquote, disgorgement order, which speaks to the $2.5 million component. And the primary focus was? The primary focus was, one, restarting this program through a disgorgement order. Two, their theory of medical malpractice based on the breach of the doctrine of informed consent. That was their theme. Based on, especially given the fact that immediately before the preliminary injunction hearing, they produced an expert report, which drove that home and was, as Patricia Bergeson put it, not a good development for them. Lastly, I just want to point to the exclusionary language on the medical malpractice issue. The exclusionary language of the landmark policy is liability attributable to professional medical malpractice, including the rendering or failure to render a medical service. So the complaint here was a failure to render a medical service. They needed the money so that they could go get that medical service elsewhere. Thank you very much. Thank you. I will take the case under advisement. No, next one. Oh, you do have a cross. I do. I know you've got a cross with Bill. Your Honor, I have something very short. Sure. Go ahead. Go ahead. Lexington's counsel, I believe, just misstated the standard for the application of the estoppel doctrine. The insured does not have to show there was actually coverage in order for the insurer to be estopped. The insured has to show that there was the potential for coverage and that the insured ignored that potential and failed to defend. I think here that's clearly what happened. And the only other thing I would comment is on the landmarks contention that the A primary focus or B primary focus was not the D&O counts. Count two, the breach of fiduciary duty count, alleged that the university mismanaged the vaccine program. It mismanaged the internal review board. And in its mismanagement of those two items, it breached its fiduciary duties to maintain plaintiff's interests in the highest standards of fidelity, honesty, loyalty, and good faith, and that the breaches included allowing the plaintiffs to enter a program without that they knew would prevent them from entering a different program. It promised them an ad infinitum treatment but terminated the program. It failed to diligently act in response to the demands to restart the program, et cetera. Again, we don't have to prove, it is our submission, that there was actually coverage under even the landmark policy that didn't have a duty to defend. Because under U.S. judgment and its progeny, if the claim is potentially covered and the insured settles it in reasonable anticipation of liability, then the duty to indemnify is triggered. And in answer to your question, Justice Palmer, that's the standard. We never get to whether there actually was, in fact, a breach of fiduciary duties. You look at the complaint as it was pled, and that complaint becomes frozen in place after the settlement because the case never went far enough to actually get to these factual issues. That's what I believe the standard is. Thank you. Hey, anyone else want to speak? Thank you. Since we're suspending our rules, we might as well let everyone speak. All right. Now we'll take a case of advisement. The court is adjourned. Thank you, counsel.